**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

JUAN A. COLON,

    Plaintiff,

v.                                                CASE NO: 8:07-cv-151-T-26MAP

TOTAL RENAL CARE, INC.,

    Defendant.
_____/

**O R D E R**

Before the Court is Defendant's Motion for Summary Judgment with attachments (Dkt. 21), and Plaintiff's Response in Opposition with attachments. (Dkt. 37). After careful consideration of the Motion, the submissions of the parties, and the entire file, the Court concludes that summary judgment should be granted.

**FACTUAL BACKGROUND**

This action seeks damages for retaliation under the Florida Whistle-Blower's Act, section 448.102, Florida Statutes, and for unpaid wages of approximately 130 hours of work pursuant to section 448.08, Florida Statutes. Plaintiff Juan Colon began working for Defendant Total Renal Care, Inc. (TRC) in late 2004.[1] TRC was the dialysis provider for

---

[1] See docket 15, Ex. B (depo. of Juan Colon), pp. 20-21.

Winter Haven Hospital.[2] Mr. Colon had been employed by Winter Haven Hospital since 2001 in the area of patient transport when he began working for TRC in late 2004 as a dialysis technician.[3] His job duties for TRC included cleaning and disinfecting the dialysis machines as well as setting them up in the particular patient's room if the patient was unable to get to the dialysis room.[4] In the last four months of Mr. Colon's employment with TRC, he reported directly to Jocelyn Rada, the facilities manager.[5] Ms. Rada's direct supervisor was Billy Timmons, and Mr. Timmons' direct supervisor was Phil Grupp.[6]

Viewing the facts in the light most favorable to the non-moving party, Mr. Colon, as this Court must do on summary judgment, the following facts are set forth. One day while working for TRC at the Winter Haven Hospital, Mr. Colon saw his co-worker Ivory Benson, a Patient Care Technician (PCT), with a needle and syringe in her hand, immediately after putting a bottle of heparin on top of the dialysis machine.[7] He described this action as suspicious-looking.[8] At that time, only one patient was in the

---

[2] See docket 15, Ex. B, p. 21.

[3] See docket 15, Ex. B, pp.19-22.

[4] See docket 15, Ex. B, p. 21.

[5] See docket 15, Ex. B, p. 22.

[6] See docket 15, Ex. B, p. 24.

[7] See docket 15, Ex. B, p. 42.

[8] See docket 15, Ex. B, pp. 42 and 50.

room on a stretcher and no other people were in the room.[9] He suspected, but did not actually observe, Ms. Benson of administering heparin to a patient.[10] He said nothing to Ms. Benson and crossed the hallway to tell two nurses what he had seen.[11] Mr. Colon testified that the nurses told him that Ms. Benson administered heparin all the time and that Ms. Rada knew about it.[12] Neither of the two registered nurses has provided testimony by way of affidavit, declaration or deposition that those events occurred. Ms. Benson has denied by affidavit administering heparin.[13]

Mr. Colon testified that he knew that patient care technicians, such as Ms. Benson, were not supposed to administer heparin because they are unlicensed assistive personnel.[14] Shortly after the incident, which occurred sometime before November 30,

---

[9] See docket 15, Ex. B, p. 43.

[10] See docket 15, Ex. B, pp. 44, 50-51, and 57-58.

[11] See docket 15, Ex. B, p. 44.

[12] See docket 15, Ex. B, p. 44-45.

[13] See docket 21, Dec. of Ms. Benson, para. 3.

[14] See docket 15, Ex. B, p. 46. According to Florida's Administrative Code Rule 64B9-14.001, titled "Delegation to Unlicensed Assistive Personnel," unlicensed assistance personnel are defined as follows:
> "Unlicensed assistive personnel" (UAP) are persons who do not hold licensure from the Division of Health Quality Assurance of the Department of Health but who have been assigned to function in an assistive role to registered nurses or licensed practical nurses in the provision of patient care services through regular assignments or delegated tasks or activities and under the supervision of a nurse.

2006, Mr. Colon asked Ms. Rada to mention Ms. Benson's "pushing heparin" at an internal meeting.[15] He testified that Ms. Rada stated that she knew that Ms. Benson was "pushing heparin." Mr. Colon also stated that Ms. Rada told him that she had mentioned the problem to Mr. Timmons at the meeting held in early December 2006.[16] Mr. Colon testified that he told Ms. Rada at that time that if the problem was not remedied that he would tell the dialysis physicians at the hospital.[17] According to Mr. Colon, Ms. Rada told him that she did not want him to be a whistle-blower.[18] Mr. Colon wrote an incident report on December 21, 2006, to memorialize the chain of events.[19]

On December 13, 2006, Mr. Colon met with Mr. Timmons to voice his concerns.[20] Mr. Colon stated that Mr. Timmons told him to look for other employment and suspended Mr. Colon for three days without explanation.[21] Mr. Colon then called the Florida Agency for Health Care Administration (AHCA) on December 14, 2006, and the Chief Inspector General's office of the Department of Health (DOH).[22] Mr. Colon testified that

---

[15]  See docket 15, Ex. B, pp.47-48.

[16]  See docket 15, Ex. B, pp. 47-48.

[17]  See docket 15, Ex. B, pp. 48 and 54.

[18]  See docket 15, Ex. B, pp. 53-55 and exhibit 10 attached to the deposition.

[19]  See docket 15, Ex. B, pp. 49-53 and exhibit 10 attached to the deposition.

[20]  See docket 15, Ex. B, p. 56.

[21]  See docket 15, Ex. B, pp. 56-57.

[22]  See docket 15, Ex. B, pp. 58 and 92, and exhibit 11 attached to the deposition.

he did not tell anyone at TRC that he actually called the AHCA because he had already reported the incident at two different times to Ms. Rada and Mr. Timmons, which had resulted in his suspension.[23]  According to Mr. Colon, Mr. Grupp told him that he had fired someone who had called AHCA to report violations.[24]  Mr. Colon testified that Ms. Rada had admitted to him previously that she had warned Ms. Benson to stop pushing heparin.[25]  Mr. Timmons terminated Mr. Colon on January 10, 2007.[26]

## FLORIDA WHISTLE-BLOWER'S ACT

Defendant TRC argues that the whistle-blower's claim must fail because Mr. Colon cannot demonstrate that he was engaged in protected conduct—specifically, that the administration of heparin by a PCT did not constitute a violation of "a law, rule, or regulation."  § 448.102(3), Fla. Stat.[27]  The issue in this case is whether an actual violation of a rule or regulation occurred.  This issue is three-fold.[28]  First, the Court must

---

[23]  See docket 15, Ex. B, p. 64.

[24]  See docket 15, Ex. B, pp. 65-66.

[25]  See docket 15, Ex. B, p. 67.

[26]  See docket 15, Ex. B, pp. 88-89.

[27]  See Snow v. Ruden, McClosky, Smith, Schuster & Russell, P.A., 896 So.2d 787, 791 (Fla.Dist.Ct.App. 2005) (holding that rules governing members of Florida Bar were not included in "law, rule, or regulation" of section 448.102(3) because they do not "flow from either a legislatively enacted statute, ordinance, or administrative rule").

[28]  This issue falls under the first prong of the four-prong prima facie test for retaliation based on whistle-blowing, which is that the employee "engaged in protected activity."  See Sierminski v. Transouth Fin. Corp., 216 F.3d 945, 950 (11th Cir. 2000) (holding that in diversity case involving violation of Florida's Whistle-Blower's Act, state

determine whether there is a rule or regulation that prohibits the complained of conduct; second, whether an actual violation occurred versus a "good-faith" hunch about a violation; and third, whether the conduct is attributable to the employer, TRC. The Court finds that Mr. Colon's claim fails under the second determination because the evidence does not show that an actual violation, rather than merely a suspected one, occurred.

First, there is no question that had Ms. Benson, as a PCT, or unlicensed assistive personnel, administered or pushed heparin to a patient, it would have been a violation of a rule subject to Florida's Whistle-Blower Act. The Court finds that the rules of the Florida Administrative Code do not provide for the delegation of the duty of administering heparin to unlicensed assistive personnel (UAP). The purpose of Chapter 64B9-12 of the Florida Administrative Code, titled "Administration of Intravenous Therapy by Licensed Practical Nurses" is "to protect the public by ensuring the availability of intravenous therapy and its competent administration in the care of the ill, injured or the infirm." Fla.Admin.Code Ann. r. 64B9-12.001(2007). The remainder of the stated purpose specifically authorizes delegation to qualified licensed practical nurses in limited situations with no mention whatsoever of any delegation to *unlicensed* individuals falling under the category of UAP:

---

substantive law applies); Rice-Lamar v. City of Fort Lauderdale, 853 So.2d 1125, 1132-33 (Fla.Dist.Ct.App. 2003), rev. denied, 868 So.2d 522 (Fla. 2004) (holding that prima facie case under Florida's Whistle-blower's Act was same as prima facie case under retaliation for Title VII—(1) employee engaged in protected activity, (2) adverse employment action, and (3) causal connection between the two events).

> In keeping with the purpose, this rule authorizes the qualified licensed practical nurse to administer those aspects of intravenous therapy within the scope of practice of the licensed practical nurse, enumerates those aspects of intravenous therapy outside the scope of practice of the licensed practical nurse, and sets out the educational and/or competency verification necessary to administer, under direction, limited forms of intravenous therapy.

Fla.Admin.Code Ann. R64B9-12.001(2). Another rule lists the specific tasks that are outside the scope of practice for *licensed practical nurses* (LPNs), not UAPs. See Fla.Admin.Code Ann. r.64B9-12.003(1). Relevant to this case, heparin flushes are specifically excepted from the list of actions never to be performed by LPNs unless under direct supervision as that term is defined in the rules. See Fla.Admin.Code Ann. r.64B9-12.003(1)(f). There is simply no authority for any unlicensed individual to administer heparin with or without supervision.[29]

Having determined that the administration of heparin by UAP is unauthorized by the Florida Administrative Code, the next, and closest, factual determination is whether an actual violation occurred. Florida law requires an actual violation of a law or rule be committed. See White v. Purdue Pharma, Inc., 369 F.Supp.2d 1335, 1338 (M.D. Fla. 2005). It is insufficient for the employee to reasonably believe or suspect that a violation

---

[29] Chapter 64B9-14, titled "Delegation to Unlicensed Assistive Personnel" contains a rule that lists the factors to be weighed by a *licensed* nurse when determining what tasks or activities to delegate to UAP and to which UAP to delegate those tasks or activities. See Fla.Admin.Code Ann. r.64B9-14.002(1)(2). The list includes broad-brush categories such as "complexity of the task" and "predictability or unpredictability of outcome," which do not coincide in any fashion with the intravenous administration of therapy.

has occurred. Id. at 1337.   The initial explanation of what Mr. Colon observed does not sound the death knell; however, his admission later in his deposition does.

At his deposition, Mr. Colon described what he saw as follows:

> What I witnessed was me going into the room where the patient care tech has a patient here.  They're to my left.  I turn around.  I see the patient care tech.  She had a needle and syringe in her hand.  And she had just put the bottle of heparin on top of the machine.  And it was suspicious looking.[30]

On further questioning at his deposition, Mr. Colon was asked the following questions and gave the following answers:

> Q: Just so I'm picturing this correctly, is this a pretty typical looking hospital room with two beds in it?
>
> A: Well, there were no beds in hospital because the patient would come in on a stretcher.
>
> Q: It was a room with a door?
>
> A: Right.
>
> Q: And there was a space for two stretchers?
>
> A: Right.
>
> Q: And Ivory would typically work in that room?
>
> A: That particular room, she also worked there.
>
> Q: And you walk in?
>
> A: Right.

---

[30] See docket 15, Ex. B, p. 42.

Q: And was Ivory the only employee in the room at that time?

A: Yes.

Q: How many patients were there?

A: One, that I can recall.

Q: One patient. The patient's in a stretcher?

A: Yes.

Q: And you see Ivory with a needle and syringe in her hand?

A: And the — just putting up the bottle of heparin on the machine.

Q: How do you know it was heparin?

A: Because I order the heparin.

Q: So you know what the bottle looks like?

A: I know what the bottle looks like.

*Q: You didn't actually see her administering the heparin?*

*A: No.*

Q: Did you ask her whether she had administered heparin?

A: No.[31]

. . . .

Q: It [Mr. Colon's incident report] says, "On November 30, 2006, I informed my supervisor Jocelyn Rada, about an incident that I thought should be brought to her attention. I observed what appeared to be a patient care tech, Ivory, administering heparin to a patient." And you've now

---

[31] See docket 15, Ex. B, pp. 43-44.

described that you didn't actually see Ivory administering heparin, correct?

A: I was suspicious of what she was doing.

*Q: But just to be clear, you didn't actually observe her administering heparin?*

*A: No. No.*[32]

. . . .

Q: It was accurate that you had not seen Ivory pushing heparin since the first time you saw her with the syringe in her hand?

A: That's correct.

Q: So is it fair to say that you've never actually seen Ivory push heparin?

A: Other than the incident I described to you, what I saw that day, when I went in with Ivory with the needle in her hand, the syringe, heparin in the bottle, just putting it up, that would be about the extent of it. Did I actually see her, no.

*Q: And you've never actually seen her administering the heparin?*

*A: No.*

Q: That's correct?

A: Correct.[33]

---

[32] See docket 15, Ex. B, pp. 50-51.

[33] See docket 15, Ex. B, pp. 57-58.

(Emphasis added.)   The first description given by the deponent Mr. Colon, leaves open the question of whether he actually saw Ms. Benson touch the patient with the needle or syringe to flush or push an IV.  It is clear that he saw her place a heparin bottle on the machine.  His characterization of the incident as "suspicious" is not fatal to his claim, either.  He cannot be deemed to know and use the correct legal terms to the extent that the rule does not cover "suspected" violations but only actual violations.  The truth remains, however, that upon further questioning he admitted at least twice that he had never seen, either on the day in question or at any other time, Ms. Benson place a needle or syringe in a patient's IV.  Although there is circumstantial evidence that might have led him to believe that she had administered heparin through an IV, he candidly stated, as the only eye witness,[34] that he did not see it.  Without any independent, competent evidence that Ms. Benson committed this act, Mr. Colon's claim must fail.

The Court need not analyze the remaining elements of the retaliation claim based on the Florida Whistle-blower's Act.  Absent proof of an actual violation of the applicable rule, the claim cannot stand, and summary judgment must be granted in favor of the Defendant.

## UNPAID WAGES

---

[34] To the extent that Ms. Rada may have told Mr. Colon that she had seen Ms. Benson pushing heparin in the past, there is no question that no one other than Mr. Colon, by his own admission, witnessed the incident at issue here.

Defendant seeks summary judgment on count II because Defendant paid Mr. Colon $953.92 on February 16, 2007,[35] which constituted payment for all of his paid time off (PTO).[36]  Mr. Colon does not deny that he has been paid, albeit after filing this lawsuit, for all of his PTO.  Hence, summary judgment may be granted on count II based on its satisfaction.

It is therefore **ORDERED AND ADJUDGED** as follows:

(1)   Defendant's Motion for Summary Judgment (Dkt. 21) is **GRANTED**.

(2)   The Clerk is directed to enter final summary judgment in favor of Defendant and against Plaintiff on both counts of the Complaint.

(3)   The Clerk is directed to close the case.

**DONE AND ORDERED** at Tampa, Florida, on November 19, 2007.


　　　　　　　　　　　　　　　　s/*Richard A. Lazzara*
　　　　　　　　　　　　　　　**RICHARD A. LAZZARA**
　　　　　　　　　　　　　　　**UNITED STATES DISTRICT JUDGE**


**COPIES FURNISHED TO**:
Counsel of Record

---

[35]   See docket 26, Dec. of Sandra Stowe.

[36]   Paid time off constitutes the hours he had accrued for hours not worked before his termination.